E. BROWN BAKER and ALBERT M. BANKER, Appellants, *v.* THE STATE OF NEW YORK, Respondent.

*Improvement of the Erie canal under the act of 1895 — it was abandoned, not suspended — the State was not authorized by the contracts to abandon it — right of the contractors to recover damages for the breach.*

The action of the State of New York, upon and after the 14th day of May, 1898, in reference to the work of improving the Erie canal, which had been undertaken pursuant to chapter 79 of the Laws of 1895, was an abandonment of the work and not a mere " suspension" thereof within the meaning of a clause in the contracts for a portion of the work which provided that if the execution of the contracts should be suspended by the State at any time for any cause, no claim for prospective profits on work not done should be made and allowed, but that the contractors should complete the work when the State ordered its resumption.

The right to abandon the work before completion without incurring any liability to the contractor for prospective damages was not reserved to the State under a

provision of the bid upon which the contract was founded, by which the contractor offered "to construct and to finish, *so far as the superintendent of public works shall direct,* all of the work to which prices are affixed in the above schedule in all respects according to the contract and specifications," or by a provision in the contract that the work should be "prosecuted at the times and in the manner directed by the resident engineer" or by a clause in the specifications providing, "the State reserves the right to increase or diminish the amount or amounts of any class of work from the amount shown on the bidding sheet," and that in that event the amount of work *required* would be done at the rates named in the contract, and no claim for damages or prospective profits would be made on account of such change.

The abandonment of the work entitled the contractors to recover the money deposited by them as security for the faithful performance of the contracts and the balance due for work actually done thereunder, and — assuming that the aggregate of all the bids for the work was within the $9,000,000 authorized to be expended upon the improvement and that, at the time of the execution of the various contracts, the $9,000,000 was apportioned to the several contractors up to the amount of their respective bids — each contractor would also be entitled to recover such prospective damages, not exceeding the amount of his bid, as he could show that he had suffered by reason of the abandonment of the work.

APPEAL by the claimants, E. Brown Baker and another, from a judgment of the Court of Claims, entered in the office of the clerk of said court on the 4th day of March, 1902, "both upon questions of law and of fact, and for an insufficiency of the judgment, upon the grounds that the said judgment, insofar as it limits claimants' recovery to $5,100, the amount of the deposit, with such interest, to be computed by the Comptroller, as it has earned the State, and does not allow interest thereon at the rate of six per cent. per annum from the 14th day of May, 1898, and to $8,888.23, the balance due for work performed and materials furnished, and does not allow a recovery of $24,277.50 in addition thereto as damages for the breach of the contract on the part of the State of New York, and the interest thereon from the 14th day of May, 1898, and makes the recovery allowed conditional upon the claimants surrendering their contract described in their claim herein and releasing the State from all liability on account thereof within thirty days from the service upon them of a certified copy of this judgment, and further orders and adjudges that in case the said claimants shall not surrender said contract and file such release

within said thirty days, then the State of New York has judgment against the claimants dismissing the said claim, is against the evidence and the weight of evidence and contrary to law; and upon the further ground that the Court erred in holding and determining that the State is not in default, and that it simply lessened the amount of work to be done by the claimants up to the present time and has suspended the execution of the contract."

The contractors presented to the Court of Claims a claim against the State for damages alleged to have arisen out of a breach of a contract in which they had undertaken to do certain specified work in enlarging the Erie canal. They claim that the State had abandoned the work and prevented the complete performance thereof by them, whereby they had lost the profits which they would otherwise have derived, and also that they thereby became entitled to be paid the amount still unpaid for work actually done under such contract, and the amounts deposited with and retained by the State as security for its complete performance. The claim was denied by the court below as to the damages claimed, but they were given a judgment for the moneys earned and for those retained as security, provided they would release all further claim against the State on account of such contract or its breach. From such judgment the contractors have appealed.

*Andrew J. Nellis*, for the appellants.

*John C. Davies, Attorney-General*, and *George H. Stevens*, for the respondent.

PARKER, P. J.:

The contract, for the breach of which this claim is made against the State, provides, in substance, that, if the execution of the contract shall be suspended by the State at any time for any cause, no claim for prospective profits on work not done shall be made and allowed, but the contractors shall complete the work when the State shall order it to be resumed, and the date of such completion shall be fixed by the Superintendent of Public Works. It is claimed on the part of the State that the breach complained of is but a "suspension" under the above provision. If such claim is correct, it is plain that not only could no prospective profits be now claimed as

damages, but neither could the sums which, by the terms of the contract are to be retained until the completion of the work, be now demanded. No breach of the contract would have occurred, nor would such sums have yet become due.

But I am of the opinion that the action of the State upon and after the 14th of May, 1898, was an abandonment of the work referred to in the contract instead of a mere "suspension" thereof. The contract was then terminated by the State, and the contractors were notified to that effect. No suggestion was made that the work provided for in the contract was to be thereafter completed, or that any time would be thereafter fixed for its completion.

They were simply notified that the work was to cease, and operation under the contract was then brought to an end. Chapter 544 of the Laws of 1899 seems to be a declaration on the part of the State that it so considered the situation, and that if the contractors were willing to adopt that view and take what was due them *upon their contracts* and release all further claims, they would be paid upon that basis, including all moneys held by the State as security for the performance of the contract on their part. A clear abandonment of the scheme to improve the canal to the depth of nine feet is here shown; and it is very apparent that the breach of which the appellants complain is not the mere suspension above referred to.

We have then this situation : The contractors institute against the State these proceedings for a breach of its contract, and they claim not only the amounts due for work actually done by them thereunder, but also such damages as have naturally accrued to them on account of such breach. The amount still unpaid for work actually done is conceded to be $8,881.23; and the amount of money deposited with the State as security for the work is conceded to be $5,100. It is also conceded that, so far as they were permitted, the contractors have well and faithfully performed the work. The State having abandoned the work and prevented further performance on the the part of the contractors, it is clear that both the sum of $5,100 and the $8,881.23 are due and payable by it to the contractors; and under this view of the case, it is difficult to see why they should not recover them untrammeled by a provision in the judgment that they release all further claim for damages against the State.

But the further claim that the contractors make in this proceeding, that they are entitled to recover the profits which they would have made had the work proceeded to full completion under the contract, is not so clear.

On the face of the contract, and on the proof disclosed by the record before us, the total work which the contractors undertook to perform was, it seems to me, to " construct and to finish " the improvement of a certain specified five and eighty-seven one-hundredths miles of the Erie canal according to plans and specifications submitted with and made a part of the contract. Such is their undertaking in the first provision of the contract. No change in such plans and specifications has ever been made by the State, and it is conceded that when abandoned such work had not been completed.

Such being the obligation on the part of the contractors, it would seem, from the proof disclosed by the record, that the reciprocal obligation on the part of the State to permit them to prosecute the work to completion, and to pay them for the same, exists, unless the State has reserved to itself the right to end the work at any period of its progress. If such right is reserved, undoubtedly, no loss of profits could be claimed as damages for a breach of the contract, because in that case there would be no breach. The court below has substantially held that such is the situation here, and has, therefore, rejected the contractors' claim for such damages. If the solution of the question depends upon the construction of the terms of the contract alone, a careful study of that instrument will force the conclusion that no such reservation can be found within it.

Notice that bids for the performance of the work upon the five and eighty-seven one-hundredths miles covered by this contract would be received was published. Accompanying that notice, the plans, specifications and statement of the engineer's estimate for the work to be done thereon were submitted and filed as required by chapter 794 of the Laws of 1896 (amdg. Laws of 1895, chap. 79, §§ 4, 5). Under such notice and statement these claimants made a bid and affixed their prices per yard and per foot to the several estimated amounts of excavation, construction or material contained in such statement. They were awarded the work, and thereupon entered into the contract which is set forth at length in the appeal book. By such contract, such plans, specifications and statement are made

a part of the contract. By such statement the total cost of the work and materials to be done and furnished, less value of old materials furnished by the State, amounted, at the agreed prices, to the sum of $98,760. The work done and materials furnished by the contractors up to the time the work was stopped amounted to $75,886.23. It is proven in the case that most of the estimated amounts given in such "statement" fell far short of the *amounts* actually necessary to finish the work according to the plans and specifications referred to in the contract. The total cost of such work, at the agreed prices, would amount to $165,953.75. Thus, at the time the work was abandoned, there was still unperformed and unfurnished of the *estimated* work and materials an amount equal to the sum of $22,873.77, and of the amount necessary to complete the actual work required an amount equal to $90,067.52.

There are several provisions in the contract, specifications and statement which it is claimed amount to a reservation by the State of the right to terminate at any time it desired the work under this contract. *First.* In the *bid* which is written and signed by the contractors, at the foot of the " statement " of estimated amounts, etc., they offer " to construct and to finish, *so far as the superintendent of public works shall direct,* all of the work to which prices are affixed in the above schedule in all respects according to the contract and specifications, etc.,    * * *    this day exhibited.  * * * "
But this *offer* is no part of the contract and it is to be noticed that in the contract their undertaking is to do all the labor, etc., necessary to " *construct and to finish* in every respect " the five and eighty-seven one-hundredths miles in question, and such work is to be done according to the plans and specifications furnished, etc.   Here is a distinct undertaking on the part of the contractors to finish the contract according to the plans, and there is no provision or suggestion here that they are to do that work or so much thereof as the Superintendent of Public Works shall require.   Under the contract they are required to do it all.   And the mutual obligation on the part of the State to permit them to do it all and to pay them accordingly is not in any way limited by any provision here made.   The limitation suggested in the offer is not incorporated into the contract.

Moreover, if such *offer* is to be deemed a controlling part of the contract, then the contractors' obligation to do work would extend

only to the amounts specified in the various classes named in the statement under which it is written, for the language there used is to do "all of the work to which prices are affixed in the above schedule," etc.

It will hardly be claimed that either party expected that no more work should be done than was specified in that estimate, inasmuch as the contractor is distinctly notified that the quantities there named are "approximate only," and the provision of the contract headed "Alterations and Directions," etc., and the 28th specification, hereinafter referred to, are utterly inconsistent with that theory. So, also, the contractors in several instances did more work than was specified in the estimate, thus indicating that the parties understood that the amount of work to be done was not limited by that estimate.

In all these respects the offer differs materially from the *contract* and cannot be deemed to modify or control it.

There are certain other provisions in the contract in which it is required that the work shall be "prosecuted at the times and in the manner directed by the resident engineer," etc. These have reference to the method of carrying on the work, and clearly were not intended to provide that the resident engineer might at any time order an abandonment of the work.

It was further provided in section 28 of the specifications that "the State reserves the right to increase or diminish the amount or amounts of any class of work from the amount shown on the bidding sheet," and in that event the amount of work *required* will be done at the rates named in the contract, and no claim for damages or prospective profits shall be made on account of such change. It is insisted that this amounts to a reservation by the State of the right to cease the work at any time, without incurring any liability for damages. The argument seems to be that, under this provision, the State might diminish the amount of each class of work specified in the estimate or "bidding sheet" to little or nothing, and in that manner abandon the work long before its completion.

The whole scheme of the contract repels the idea that such was the purpose, or understood meaning, of this provision. The "bidding sheet," to which it refers, was the estimate of quantities, etc., required by the statute above cited to be made by the engineers

and submitted with the notice for bids. These quantities were approximate only. The contractors were so notified, and directed to ascertain such quantities for themselves (see page 24 of the appeal book), and the real purpose of section 28 was to protect the State from any claim for damages, or prospective profits, should it turn out upon completion of the work that the quantity of any class therein described varied from that given in such schedule. It was a mere declaration that the quantities specified in that preliminary estimate were not to be controlling upon the State. That estimate having been named in the first provision of the contract as a part of the contract, it was deemed necessary for the State to repel the possible inference that only such work as was therein specified would be required, and hence the provisions of section 28 were inserted. The idea that the completion of the work might be prevented, or evaded, under this provision never occurred to either party.

Had the real agreement between the parties been to the effect that the contractors should do all the work necessary to complete the improvement of this section of the canal, *or* so much thereof *only* as the State should require, it is fair to assume that such a provision would in *plain* and *distinct terms* have been inserted in the contract itself. In view of its absence and of its great importance, had such been the agreement, I am of the opinion that the several disconnected, indefinite and inconsistent provisions which the State now relies upon should not be construed into such a reservation. If the State is correct in its claim as to the construction of the contract, these contractors were obligated to perform work and furnish materials that, at agreed prices, would amount to at least over $98,000, and possibly much more; while the State might have ended their operations before they had earned enough to pay the expenses incurred in preparing for the work. Such an agreement is not usual and should not be inferred from language no more explicit than is to be found in this contract.

I have given so far only what seems to me a fair construction of the terms of the contract as it reads, and if it can be shown that such a contract was authorized I see no way by which the State can avoid payment of damages for its breach. But there are other considerations which are barely suggested by the record and by the

arguments which to my mind have a very serious bearing upon the proper conclusion to be reached in the premises. Until we are furnished with a record which discloses all the material facts bearing upon the question of the authority of the Superintendent of Public Works to make a contract in terms like the one before us we shall not have sufficient data for a proper determination of the matter.

It must be admitted, I think, that the Superintendent of Public Works had no power to create a contract debt on the part of the State beyond the $9,000,000 voted by the People under section 4, article 7 of the Constitution. Nor had the State the power to authorize the creation of a debt beyond that sum. Hence it would seem that if the aggregate of the contracts let contemplated the expenditure of a greater sum, then as to such excess they are not enforcible against the State. It would, perhaps, seem plainer if the entire improvement was under a single contract. No one, I apprehend, would then say that a contract involving an indebtedness of $20,000,000, where a debt of only $9,000,000 was authorized, could be enforced beyond the $9,000,000 appropriated. This seems to have been clear to the Legislature in conferring upon the Superintendent of Public Works the power to contract. The Legislature intended to keep within its constitutional powers, and did not intend that the aggregated contracts should involve the making of improvements beyond the sum voted by the People. This is plain from the reading of the act of 1895 (Chap. 79) and the act as amended in 1896 (Chap. 794). By the amendment of 1896 it was provided that "None of the work called for by this act shall be contracted for until the State Engineer shall have ascertained with all practicable accuracy the quantity of embankment, excavation, masonry, the quantity and quality of all materials to be used *and all other items of work* to be placed under contract, and a statement thereof, with the maps, plans and specifications, corresponding to those adopted by the Canal Board and on file in the office of the State Engineer, is publicly exhibited to every person proposing or desiring to make a proposal for such work. *The quantities contained in such statement shall be used in determining the cost of the work.*" The act then provides for filing the proper maps, etc., with the State Engineer, and that no alteration shall be made in the specification or the plan of any work under contract during its progress, except an

approval of such alteration be in writing signed by the parties. " No change of plan which shall increase the expense of any such work, or create any claim against the State for damage arising therefrom, shall be made," unless a written statement is submitted to the Canal Board and its assent is obtained.

It is here contemplated that the bids should be for specific work, and the price bid should determine the *cost of the improvement contracted to be done.* Safeguards are provided against any increase over the sum bid, and, if these directions were adhered to, it was reasonable to suppose that the aggregate of the sums bid would fairly determine the whole cost of the entire improvements contracted for. If the aggregate of these bids was within the $9,000,000, it would seem that the contracts up to the bids made on each would have been authorized. I assume that such was the fact, to wit, that the aggregate of these bids was within that sum, though this record shows nothing on the subject. If the sum of these bids practically exhausted the $9,000,000, I do not see how there remained any room for expansion in any contract, and the elastic quality in the direction of increase over the sum bid in any contract would seem under this theory to have been prohibited. I deduce from this that the $9,000,000 was, at the time the bids were accepted and contracts entered into, divided up and to each contract was apportioned the sum stated in the bid, which the law said should determine " the cost of the work ; " and if the contract in terms contemplated the expenditure of any sum beyond the sum so apportioned, it was to that extent unauthorized. For the same reason it would seem also that if any sum has been paid to any contractor beyond the sum bid, such payment was unauthorized, because there was no fund from which it could be lawfully paid ; and it could not be properly taken from the sum apportioned to any other contractor. If we are right in this theory of an apportionment of the $9,000,000 to the several contractors up to the amount of their bids, we are lead to the conclusion that each contract was binding upon the State up to the amount of the bid and not beyond — provided, of course, that the aggregate of the bids did not exceed $9,000,000 — and that any abandonment by the State of any contract before the amount of the bid had been exhausted was a breach and entitled the contractor to prospective profits for work undone up to the amount

of his bid and no more.   A retrial of this case will doubtless develop the necessary facts suggested and made necessary to the record for a proper disposition of the claim.   Section 10 of article 7 of the Constitution cannot here be invoked to give legality to the contracts made under the $9,000,000 act.   There does not appear to have been any money in the treasury applicable to the improvements contemplated, nor did the Legislature appropriate any money from the treasury.   The Legislature might levy a tax and appropriate money for improvements contemplated to be made, but this clause does not authorize the creation of an indebtedness nor the raising of money to pay an unauthorized indebtedness; otherwise the limitation of section 4 of this article of the Constitution might be made wholly inoperative.

Our conclusion that the contract has been abandoned on the part of the State entitles the claimants to a judgment for money conceded to be due for the work actually done, and for the sum deposited as security for performance of the contract.   And if the facts shall prove to be, what it has been suggested that they really are, viz., that the aggregate of the contracts upon their face, as shown by the estimates and bids, was not in excess of the $9,000,000 voted, the plaintiffs may be entitled to such damages as they can show that they have suffered by reason of the abandonment on the part of the State before the sum of $98,760, the amount of plaintiffs' bid on the estimate presented, was exhausted.

The judgment of the Court of Claims is reversed, with costs, and a new trial before the Court of Claims is directed.

All concurred.

Judgment of the Court of Claims reversed, with costs, and a new trial before the Court of Claims granted.